EDWIN G. STILES and EPHRAIM LOCKWOOD *v.* HENRY T. HOW-
LAND and JOHN H. · PHILIPS, Survivors, &c., of ABNER
LOVELAND.

Where the vendee can stop the goods while in the hands of the carrier, he can
retain them in his own possession, if he has not delivered them to the carrier.

Where the vendor proposes to the vendee to take back a part of the goods sold,
and to give his note on time for the same, and the vendee accepts the propo-
sition as to returning such part of the goods, and refers the vendor to his part-
ner to make arrangments as to the note on time, and shortly after sends the
goods to a third party, to the care of the vendor, it was *held*, that the title
did not repass until the vendor had arranged for the giving of his note on
time.

Consequently, that a sale of such goods by the vendor to such third party to
whom they had been sent, before there had been an arrangement for the
credit to be given, did not vest the title thereto in such third party.

THE defendants are millers and manufacturers of flour at
the city of Troy, in this State. On the 18th of November,
1856, they sold and delivered to one Charles Poucher 125
barrels of flour upon a short credit. On the same day,
Poucher sold 100 barrels of the same flour to the plaintiffs,
who are dealers in the article at Victory, in the county of
Saratoga. On the 31st of December thereafter, the plain-
tiffs, in a letter to Poucher, complained of the inferior
quality of the flour and desired him to take back 50 barrels
and allow them $40 for the damages sustained on the 50
barrels not returned, together with the $12.50 for the
expenses of transportation. This proposition is contained
in a letter of that date, and saying therein: "This is the
best terms we can offer, and you can settle with Mr. Styles, ·
too, for the 50 barrels returned and the $52.50 deduction on
what we keep and carting back 50 barrels to Mechanicville.
Please answer immediately, and send us how we shall direct
the flour if you accept this offer." Poucher replied to this
proposition by letter of the 7th January, 1857, agreeing to,
and accepting the offer, with the qualification that he would
give his paper for the flour returned at 25 and 45 days, with
the interest, saying: "In this way only can I consent to

have it returned. You may ship it to Howland, Loveland & Co., my care, and advise as soon as shipped, the sooner the better." On the 8th of January, the plaintiffs acknowledged the receipt of Poucher's letter, and replied thereto by their letter of that date: "The 50 barrels of flour we will send to the railroad in a few days, and in regard to the paper on time, I shall leave altogether with you and Mr. Stiles to arrange. We will send the flour, as you order, to Loveland, Howland & Co." On the 5th and 10th of January, 1857, both before and after the acceptance of Poucher's proposition, being indebted to the defendants for the same flour, he proposed to them to take back the 50 barrels in part payment of their debt. On the 10th, the defendants accepted his proposition and closed and completed the negotiation by crediting him upon their account the value of the 50 barrels of flour, and taking his note for the balance of the account, which has since been sued and put into judgment, but remains unpaid. On the 16th of January, 36 barrels, and on the 17th of the same month, 14 barrels of the flour arrived at the railroad depot directed to the defendants, who, having received notice thereof from the railroad company, sent three teams and drew it to their warehouse, after having paid 8 cents per barrel railroad freight thereon. The flour was sent forward to the defendants by the plaintiffs in accordance with the directions contained in Poucher's letter of the 7th January, 1857. Poucher was insolvent at the time. He became aware of his insolvency on the evening of the 10th of January, and made an assignment for the payment of his debts on the 12th of January. His failure was caused by indorsements of paper made for the benefit of others. There is no proof to show that the defendants were aware of Poucher's insolvency until the evening of the 10th of January, and after the settlement of their account with him and the acceptance of his note for the balance. The action upon these facts was first tried before Mr. Justice POTTER, who nonsuited the plaintiffs, which was afterwards set aside and a new trial ordered by the General Term of the Supreme Court for the fourth district. It was tried a second time by

Mr. Justice DAVIES, who directed the jury to find a verdict for the plaintiffs in accordance with the judgment of the General Term. Judgment was entered upon the verdict, from which the defendants have appealed to this court.

*E. F. Bullard,* for the respondents.

I. The flour was not delivered on *credit,* or intended to be, unless the plaintiff, Stiles, who resided at Cohoes, should consent to take the paper offered. That is the only construction to be put upon Mr. Lockwood's letter. Stiles never consented to take the paper; but when he went to deliver the flour and decide upon the credit, it had already been converted by the defendants. (*Tipton* v. *Feitner,* 20 N. Y., 423, 425; 14 Wend., 31; *Acker* v. *Campbell,* 23 id., 372; *Smith* v. *Lynes,* 1 Seld., 41; *Graves* v. *Dudley,* 20 N. Y., 76.)

Whether the delivery was absolute depends upon the *intent* of the parties.

"The conditional delivery need not be declared in express terms, but may be proved by circumstances.

"In cases of doubt, the question of *intention* was one of fact for the jury." (1 Seld., 45.)

In this case, that question has been settled by the jury. (1 Paige, 492; 10 Moore, 53; 10 Barb., 193; 15 N. Y., 409.)

The payment of the forty dollars, &c., was also a condition precedent.

II. Even if the plaintiff, Lockwood, did, by that letter, consent, the flour was not forwarded until two days after Poucher had failed.

In any event, the contract could not be considered complete until the flour was forwarded, and then the plaintiffs acted under a mistake of fact.

It may be likened unto the case of the death of Poucher before the plaintiffs had accepted his offer; or like an offer by Poucher to exchange a canal boat for the flour, when, in fact, the boat was burned before plaintiff wrote, but of which both were ignorant.

The *notes* of the insolvent are no better pay than a canal boat, or other *property* destroyed by fire. " Courts of equity sometimes relieve, in case of mistake, where the property intended to be sold or bought, did not, in fact, exist, or where the subject matter is variant," &c. (Willard's Eq., 69 ; 8 Paige, 321 ; 4 Kern., 143–149 ; 18 Barb., 545, and cases cited in appellants' points.)

III. In this case the plaintiffs had the right to stop the property *in transitu* until *Poucher* had taken possession of the property, or done some *act* to show that he intended to control it after his failure. He did no such act, and after the flour was forwarded, or after his failure, never gave such authority. Without waiting for authority from him, or for freight, the defendants seized it wrongfully and refused to allow Stiles to stop it. (*Covell* v. *Hitchcock*, 23 Wend., 611.)

*Harris* v. *Pratt*, decided in Court of Appeals, September, 1858. The goods were shipped to vendees in New York, and ship arrived, their assignee had entered them at the custom house, but not actually taken from the ship, when the court hold that the plaintiff could stop them. (*Jones* v. *Bradner*, 10 Barb., 193.)

IV. The defendants having taken the property on a pre-existing debt, are not *bona fide purchasers*. (*Root* v. *French*, 13 Wend., 570 ; *Harris* v. *Pratt*, cited above.

V. The foregoing points are based upon the assumption, there was no fraud on the part of Poucher. Whereas, in fact when he wrote the letter on *Wednesday, 7th January*, and when he agreed to turn the flour over to defendants on *Saturday, 10th January*, he did not *intend* to pay for this property. No matter how complete the sale and delivery, such intent avoids the whole, and no title passes. (*Ash* v. *Putnam*, 1 Hill, 302, 305, COWEN, J.)

" A purchase with intent not to pay, is such a fraud as will avoid the sale." (See cases cited ; *Carey* v. *Houtaling*, 1 Hill, 311 ; same doctrine, 13 Wend., 570 ; *Brower* v. *Peabody*, 3 Kern., 121.)

The case (1 Seld., 41) relied on by the defendants, has no

application to this point, as no fraud was pretended in that case, but the case is applicable to point I.

The plaintiffs could rescind as soon as they discovered the fraud. In fact, Poucher did not pretend to take or interfere with the property after his failure. His conscience would not allow it. Nothing being paid by defendants, or Poucher, a mere demand was a rescission of the contract. (*Stevens* v. *Hyde*, 32 Barb., 171.)

*N. Davenport*, for the appellants.

I. By the agreement entered into between the plaintiffs and Mr. Poucher, the title to the 50 barrels of flour became vested in Mr. Poucher, and he could and did give a good title thereto to the defendants.

The evidence does not show any fraud committed by Poucher in purchasing or taking back the 50 barrels of flour from plaintiffs. There is no evidence of concealment or representations, of any kind, in relation to his pecuniary circumstances, and no evidence that he knew he was insolvent at the time the agreement was made with plaintiffs and with defendants. But if Poucher knew, at the time of sale, that he was insolvent, and concealed the fact, it did not amount to fraud. (*Mitchel* v. *Worden*, 20 Barb., 258, 259; *Nicholas* v. *Pinner*, 18 N. Y., 295.)

The contract of sale was unconditional, and was simply this: Mr. Poucher stated to plaintiffs, in writing, that he would accept their proposition of sale if they would take his notes on time, but not otherwise; and that if they decided to accept his notes on time they might ship the flour to defendants. To this the plaintiffs replied by letter, stating that they had received his letter and would ship the flour to the defendants as he had directed. Here was a meeting of the minds of the parties, and the plaintiffs, by stating that they had received Poucher's letter, and would ship the flour to defendants as directed, signified their assent to Poucher's modified acceptance, which completed the contract of sale. (*Hough* v. *Brown*, 19 N. Y., 114.)

II. The right of property in the flour having passed to

Poucher on the 8th day of January, the defendants, by their purchase of the flour from Poucher on the 10th day of January, acquired a valid title thereto as against the plaintiffs.

The defendants were *bona fide* purchasers. They not only discharged a pre-existing debt, but paid and advanced money for the transportation of the flour to Green Island, and for the cartage of same from Green Island to their store in Troy. (Denio, J., in *Wood* v. *Chapin*, 13 N. Y., 519; *Farrington* v. *Frankfort Bank*, 31 Barb., 187.)·

Denio, Ch. J. The plaintiffs had a lien on these fifty barrels of flour for the purchase price, and, upon the insolvency of Poucher, they might have retained them until the price agreed upon had been paid. This they no doubt would have done if they had heard of the insolvency of Poucher. This right of withholding the property is not precisely the same thing as the right of stoppage *in transitu*, but it has a strong analogy to it. Where the vendee could stop the goods while in the hands of the carrier, he can retain them in his own possession if he has not delivered them to the carrier. But in this case the goods were sent to the defendants at Troy. I understand them to have been storehouse keepers, though this is not expressly stated. At any rate they were made the depositaries of the goods on their arrival at Troy, and they had no other right to them so far as the plaintiffs were informed. Their possession was not, under the circumstances, the possession of Poucher. They were third parties, who were to take and hold the goods on their arrival at Troy, not as Poucher's agents, but in the character of warehouse keepers. It was not the intention of the plaintiffs that the deposit with them should be an absolute delivery to Poucher. An arrangement as to the payment was to be first made. Stiles lived at Cohoes, near Troy, and could confer with Poucher any day. Poucher had agreed to take back the fifty barrels of flour at the price proposed, and had offered to give his paper at twenty-five and forty-five days for that price. The plaintiffs had not assented to this part of the proposal. On the contrary, the partner who wrote the letter

in their name of the 8th January, 1857, said that, in regard to that part of the proposal which looked to the giving of Poucher's paper on time, he should leave it altogether with him, Poucher, and Mr. Stiles, to arrange. The effect of the transaction was that the flour should be forwarded to the defendants to abide the result of the arrangement to be made respecting the credit to be given, if Stiles should think proper to give a credit. If Stiles and Poucher had conferred together at any time after the failure of the latter, no credit would have been given without security. But without any attempt to answer the terms of payment or of credit, Poucher and the defendants contrive, so far as they were able to do it, to vest the title in the defendants. But Poucher could not confer upon the defendants any better title than he had, and he had none until he had arranged the terms of payment with Stiles. Until that should take place the flour was in the hands of the defendants as warehousemen.

It may be said that as the plaintiffs sent the flour as requested by Poucher, it was a perfect delivery to him, and vested the property in him. I doubt whether that is a fair construction of Poucher's own letter. He wished the flour sent to the defendants, not as parties who were entitled to it under an arrangement with him; no arrangement by which they were to have it had then been made, and if it had been it had not been communicated to the plaintiffs. I do not think Poucher contemplated an immediate absolute delivery. Upon his own proposal he was to give his paper on time, and as Mr. Stiles lived in his neighborhood he doubtless expected to deliver the notes to him before he should be entitled to the flour. The words " my care " do not necessarily mean on my account or for my use. But however this may be, and if the letter ought to be understood as looking to a delivery which should give Poucher the control of the property on its arrival, the plaintiffs did not assent to it in that sense, but required the terms of payment to be arranged in the manner mentioned, before Poucher should be entitled to the flour.

The facts upon which the plaintiffs' rights depended were

undisputed, and the Judge was, in my opinion, right in directing a verdict in their favor. Hence I am for affirmance.

BROWN, J., dissenting. There is no evidence tending to show as suggested by the plaintiffs' counsel, that Poucher purchased the flour fraudulently. That he was insolvent at the time, and unable to meet all his liabilities, does not establish a fraudulent purpose, as has been held in this court in *Nichols* v. *Pinvier* (18 N. Y., 295). Nor does the omission to disclose his insolvency to the vendor prove the fraudulent intent. Where no inquiries are made of the vendee, and he makes no false statements, nor resorts to any artifices to mislead the vendor in regard to his condition and ability to pay, it is not fraudulent for him to remain silent in respect to his pecuniary resources. The present case is marked by the entire absence of anything of the kind. The negotiation with the plaintiffs was conducted on paper, and we are able to see precisely what was said and done. It is to be observed that Poucher did not apply to the plaintiffs to purchase the flour; they had purchased the fifty barrels, with others, from him; they became dissatisfied with the quality, it probably not suiting their customers, applied to him not to buy, but to take the flour back at the price they had paid for it. And when he acceded to their proposition to return the flour, he restored it to the manufacturers to whom he was indebted for it at the price which they charged him for it. In the conversation between Poucher and Loveland, one of the defendants, which resulted in their agreement to receive the flour again, the former spoke of the flour not giving satisfaction, and he would have to take it back, and that he wished the defendants to take it back from him. These facts repel, I think, all idea of fraud by Poucher, for he derived little or no benefit from the transaction. The appeal must be determined, I think, upon the single question whether the contract of sale between the plaintiffs and Poucher was executed or not.

I have suggested that the transaction had more resemblance to rescission of a sale already made, of an article which

the vendee did not design to purchase, than a new or resale of the same article back from vendee to vendor. This may not be strictly and technically true. But it is a consideration which will aid us somewhat in understanding what the parties intended by what they did. It is suggested in the prevailing opinion in the court below, that the plaintiffs' letter to Poucher of the 8th January, in reply to his of the 7th of the same month, was not a meeting of the minds of the parties as to the sale or return of the flour, and that it left the terms of the contract as to payment still unsettled. If this suggestion be true, then certainly there was no sale, for if the minds of the parties did not meet through what was said in the two letters, they did not meet by any other means. Poucher, in his letter of the 7th, says, in substance, I will allow you damages on fifty barrels of flour kept, $40.00; expenses to cars, $12.50; give Lockwood, Stiles & Co., my paper for the fifty barrels returned, at twenty-five and forty-five days, on interest. In this way only I consent to have it returned. You may ship it to Howland, Loveland & Co. Mark the significance of the words, " In this way only can I consent to have it returned." On the 8th, the plaintiffs acknowledged the receipt of the proposition, and in reply, wrote: " The fifty barrels of flour we will send to the railroad in a few days, and in regard to the paper on time, I shall leave altogether with you and Mr. Stiles to arrange; we will send the flour, as you order, to Loveland, Howland & Co." In no other way would Poucher take back the flour but that named in his letter, and forthwith the plaintiffs reply, we will send it as you order. And in execution of the contract the flour was sent to the defendant. This can mean nothing else but a meeting of minds · upon the contract of sale, followed by an actual delivery in execution of the agreement. True, the plaintiffs also say, we shall leave it altogether with you and Mr. Stiles to arrange in regard to the paper on time; this was in effect to say, we accept your offer, and deliver you the property. You and Mr. Stiles can arrange in regard to the paper on time, at your convenience. No doubt they could have withheld the delivery of the flour

until the delivery of the notes and the payment of the damages and expenses, because they were concurrent acts. Nor can there be any doubt that they could waive the act to be done by Poucher, and consent that it should be done at a future time. This is what I think they intended to do, for their acts in delivering the property to the defendants admits of no other sensible interpretation. The defendants received the flour without any notice that the plaintiffs claimed it; they gave Poucher credit for it and closed their accounts with him upon the faith of it, taking his note on time for the balance due them. They paid the freight to the depot, and incurred the expense of transporting it from them to their mill or warehouse. I think they are to be deemed purchasers in good faith.

In executory contracts for the delivery of goods sold, to be paid for at the time of delivery in the notes of a third person, who becomes insolvent between the time of making the contract and that appointed for its performance, the vendor is not bound to deliver the goods upon tender of the notes, because the consideration has wholly failed. (*Benedict* v. *Field*, 14 N. Y., 595.) But even in such a case, if the goods have been delivered without qualification before the insolvency has happened or become known, the vendor cannot rescind the sale. His only remedy for the price is to accept the note.

There should be a new trial, with costs to abide the event.
Judgment affirmed.